2026 IL App (2d) 260120-U
No. 2-26-0120
Order filed June 18, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

HECTOR B. LUVIANOS, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Julia A. Yetter, Judge, Presiding.
No. 25-CF-2973

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

## ORDER

¶ 1   *Held*: The trial court did not err in denying defendant pretrial release where defendant was charged with first degree murder for stabbing his wife over 40 times and striking her repeatedly with a hammer. Affirmed.

¶ 2   Defendant, Hector B. Luvianos, appeals from the denial of his pretrial release under section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1 (West 2024)). For the following reasons we affirm.

¶ 3                       I. BACKGROUND

¶ 4   On December 23, 2025, defendant was arrested and charged via complaint with two counts of first degree murder (720 ILCS 5/9-1(a)(1, 2) (West 2024)) arising out of an incident in which defendant killed his wife, Noemi Parada Narvaez.

¶ 5     On December 24, 2025, the State filed a verified petition to deny pretrial release pursuant to section 110-6.1 of the Code. A hearing was held on the State's petition the same day, following which the trial court granted the State's petition to deny pretrial release.

¶ 6     At the pretrial detention hearing, the State asked the court to take judicial notice of the police synopsis. According to the police synopsis, at approximately 4:38 a.m. police responded to a "check welfare incident" at defendant's apartment. According to dispatch, a 911 caller had stated that he killed his wife. Police arrived and took defendant into custody. Police found Narvaez dead near the entrance to the apartment.

¶ 7     Police obtained a recording of the 911 call. The caller stated via Spanish interpreter that he had just killed his wife. He explained that "she started to beat me" "I defended myself and I exceeded myself and I killed her." The caller stated that he used a knife and a hammer to kill the victim, and that the knife and hammer were on the kitchen table. The caller advised that he and the victim had been drinking. When asked if he was injured, the caller stated that he had cuts to his fingers and mouth and "many other injuries." The caller ultimately identified himself as Hector Luvianos. The call concluded with the caller being advised to walk out of the apartment with his hands up, and with what sounded like police taking the caller into custody.

¶ 8     Police photographed defendant and his injuries. His clothes and body were stained red. He had an abrasion on his face, injuries to his right hand, and abrasions on his chest, back, and arms.

¶ 9     Defendant was interviewed by police and related that he had been in a relationship with Narvaez for eight years. The two had lived together for five years at a previous residence, but due to relationship issues, they were no longer living together. Narvaez primarily lived with the father of her children but would spend a couple nights a week at defendant's apartment.

¶ 10     The evening of the incident, defendant and Narvaez were drinking and watching a movie. Defendant had around eight drinks. He got up to go to the bathroom and when he returned, Narvaez began yelling at him and accusing him of infidelity. Defendant denied having other romantic partners and explained that this was a common argument and that drinking made Narvaez paranoid. Narvaez then began throwing objects around. She threw a ceramic or stone cross at defendant's face causing his swollen lips. Narvaez entered the kitchen and defendant hugged her to try and defuse the situation. Narvaez placed her right hand around defendant's waist and reached back with his right hand, felt that Narvaez had picked up a knife and cut himself on it while reaching behind him. Police noted that defendant did have injuries to his right hand.

¶ 11     The two then began wrestling as defendant tried to disarm Narvaez. Defendant punched Narvaez in her left eye with his right hand. Defendant retrieved a hammer and struck Narvaez's right wrist, causing her to drop the knife. Narvaez retrieved the knife and defendant knocked her down, but she was able to quickly rise back up. Defendant then struck Narvaez on the right side of her head, near her temple. She dropped the knife and fell backwards. Defendant then retrieved the knife. Narvaez moved backwards on the floor towards the entrance. She got up and attacked defendant again. Defendant still had the hammer and knife and he stabbed her near her collarbone. He also hit her with the hammer "a lot." Defendant admitted to stabbing Narvaez in the back as she tried to get away. Defendant stated that he thought about slicing her neck. Defendant stated that he wanted to kill Narvaez in that moment. He stabbed and hit her until she stopped breathing.

¶ 12     When asked by police if he had the opportunity to leave the apartment prior to physical violence, defendant said yes. Defendant also explained that when he had Narvaez in the bear hug, she headbutted him, and that when she was on her back on the ground, she kicked at his chest with her high-heeled shoes.

¶ 13    After obtaining a search warrant for the apartment, police located a knife and a hammer on the kitchen table. They were both stained red and the hammer's head had separated from the handle. There were red stains in the living room and kitchen. Various items were strewn about the room including a cross. Narvaez was barefoot.

¶ 14    An autopsy was performed on Narvaez. The forensic pathologist noted that Narvaez had a strong odor of sweet alcohol. There were two large incised wounds to Narvaez's neck with the jugular veins cut and several smaller superficial wounds about the neck area. There was a stab wound to the right side of the chest from the back. There was a basilar skull fracture at the right base of the skull caused by blunt force trauma. There were 20 to 30 stab wounds to the head including one to the right eye, and 20 to 25 stab wounds to the back, neck, and chest. Thirteen of the stab wounds were to her back. There were lacerations and tearing from blunt force trauma. There also appeared to be defensive wounds to Narvaez's hands.

¶ 15    The State also proffered that defendant's criminal history consisted of a 2018 Class A misdemeanor DUI conviction, for which defendant was placed on court supervision, which he completed successfully.

¶ 16    The trial court granted the State's petition to deny pretrial release, stating that defendant's uncontrollable actions demonstrated that he was a danger to the community and that no combination of conditions could mitigate that danger.

¶ 17    On February 5, 2026, defendant filed a motion for relief pursuant to Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024). On February 11, 2026, defendant requested that the trial court review his detention on the basis that defendant had additional information to proffer. If released he would be able to live with his coworker. Before his arrest, defendant worked at a restaurant and believed he could return to work if released. He attended church on Mondays.

¶ 18    Further, the defense had obtained additional information from police reports. Police spoke to Narvaez's daughter who confirmed that her mother would get violent, that she had wanted to stop drinking because she did bad things, and that she had been scared of herself. Police also spoke to Narvaez's ex-husband who had left Narvaez because she punched him in the face and broke his nose. He also related that Narvaez had told him about an incident where she punched defendant and he punched her back.

¶ 19    The trial court denied defendant's motion for detention review and, on February 13, 2026, defendant filed an addendum to his motion for relief, adding the information proffered at the February 11 hearing. A hearing was held on defendant's motion for relief on March 11, 2026, and the trial court denied defendant's motion. Defendant timely appealed.

¶ 20                                II. ANALYSIS

¶ 21    On appeal, defendant argues that the State did not prove by clear and convincing evidence that (1) defendant posed a real and present threat to the safety of any person or persons or the community based on the specific articulable facts of the case, arguing that the trial court relied exclusively on the nature of the charged conduct, the evidence supported that Narvaez was the initial aggressor, and defendant did not have a history of violence and that (2) the State did not prove by clear and convincing evidence that no condition or combination of conditions could mitigate the threat posed by defendant as defendant had successfully completed court supervision for his previous DUI conviction, electronic home monitoring and SCRAM monitoring were available, and as Narvaez was the initial aggressor, the circumstances which led to the instant incident are unlikely to recur.

¶ 22    All defendants shall be presumed eligible for pretrial release, and the State shall bear the burden of proving otherwise by clear and convincing evidence. 725 ILCS 5/110-6.1(e) (West

2024). To deny a defendant pretrial release, the State must show that (1) the proof is evident or the presumption great that the defendant has committed an eligible offense, and (2) the defendant poses a real and present threat to the safety of any person or persons or the community, which (3) no condition or combination of conditions can mitigate. *Id.* The trial court's finding that no combination of conditions can mitigate the threat posed by a defendant must be based on the specific articulable facts of the case. *Id.* § 110-6.1(e)(3). When parties to a pretrial detention hearing proceed solely by proffer and documentary evidence, the reviewing court's standard of review is *de novo*. *People v. Morgan*, 2025 IL 130626, ¶ 51. Under a *de novo* standard, the reviewing court performs the same analysis as the trial court, determining whether the trial court's decision was correct as a matter of law. *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 23 We disagree with defendant's assertion that the trial court was not entitled to rely on the allegations of the charged offenses in finding that defendant posed a real and present threat to the safety of the community. Among the statutory factors to be considered by the trial court in making a determination of dangerousness, the first is the nature and circumstances of the charged offense. 725 ILCS 5/110-6.1(g)(1) (West 2024); see also *People v. Stock*, 2023 IL App (1st) 231753, ¶ 18 (while the base allegations that make up the *sine qua non* of a violent offense are insufficient to establish that no condition or combination of conditions could mitigate the threat posed by a defendant, the alleged facts stating the basic elements of the offense are relevant proof in establishing this element).

¶ 24 The particular facts of the instant case demonstrate an especially violent murder. Defendant stabbed Narvaez 40-55 times throughout her head, eye, jugular vein, back, neck, and chest. Defendant also struck her with a hammer "a lot" ultimately leading to the hammerhead separating from the handle. Defendant told police that, in the moment, he wanted to kill Narvaez and slit her

throat. While there is evidence to suggest that Narvaez may have been the initial aggressor, that fact does little to mitigate against the extreme violence displayed by defendant.

¶ 25    Additionally, although defendant does not have a violent criminal history, he does have a prior DUI and stated that he had eight drinks prior to killing Narvaez, which indicates defendant continues to drink to excess despite obvious difficulty controlling himself while drinking. As such, there was sufficient evidence to support the finding that defendant posed a real and present threat to the safety of the community.

¶ 26    Turning to whether conditions can mitigate the threat posed by defendant, he maintains that conditions exist which could mitigate any threat he posed, such as electronic home monitoring and SCRAM monitoring. Further, his pretrial assessment score was one out of six and his successful completion of court supervision in his 2018 DUI demonstrates that he is able to comply with pretrial conditions. We disagree.

¶ 27    The instant offense occurred at the defendant's residence, was committed using common household items, and involved extreme violence. Although defendant has killed the person to whom he posed the greatest threat, he continues to pose a serious threat to the community generally. Defendant requested that he be allowed to work at a restaurant while on electronic home monitoring and proffered that he would be living with a co-worker. The court cannot impose conditions which would prevent defendant from coming into contact with knives or other weapons, or other people who may provoke him. The extreme violence and "overkill" in this case indicate a severe lack of restraint and self-control, which pretrial release conditions cannot alleviate. Accordingly, there was sufficient evidence to support the finding that no condition or combination of conditions can mitigate the threat posed by defendant.

¶ 28                                    III. CONCLUSION

¶ 29    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 30    Affirmed.